**In re C. Marshall BENNETT & Faye H. Bennett, Debtors.**

**Bankruptcy No. BK84–1098.**

United States Bankruptcy Court, N.D. Alabama, W.D.

June 10, 1985.

H.C. Wiley, Jr., Jasper, Ala., for debtors.

Griff O'Rear, Jasper, Ala., for First Nat. Bank of Jasper.

Marvin E. Franklin, Birmingham, Ala., for Nat. Refining Co.

## MEMORANDUM OF DECISION

GEORGE S. WRIGHT, Chief Judge.

This matter is before the Court after the debtors have sold certain real estate known as the "Curry School Property", free and clear of liens and encumbrances with said liens and encumbrances to attach to the proceeds of the said sale. The debtor filed a REPORT OF SALE with the Court on December 6, 1984 which was approved by the Court on December 12, 1984. This sale generated proceeds in the amount of eighty-five thousand and no/100 ($85,-000.00) dollars. This dispute, between First National Bank of Jasper (hereinafter called "First National") and National Refining Company, (hereinafter called "National Refining"), holders of secured claims, centers upon the disbursement of proceeds of the sale which remain after this Court's order of May 9, 1985 disbursing $60,784.60 and $17.90 each day thereafter to the first mortgagee First National. This memorandum shall constitute the findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## FINDINGS OF FACT

Prior to March, 1979, Mr. Bennett operated a store under the name of Bennett's Bait & Tackle on one of three parcels which make up the "Curry School Property." Mr. Bennett financed his inventory of boats under a floor plan agreement with First National. In order to consolidate his various debts, Mr. Bennett borrowed $54,-239.35 from First National. In consideration for this loan, First National was assigned a mortgage on the boat store property which had been executed in favor of the Central Bank of Walker County in the face amount of $25,000 (hereinafter called "the Central Bank mortgage") and a mort-gage in the face amount of $50,539.62 on the boat store property and the two other parcels (hereinafter called the "1141 mortgage").[1]

The 1141 mortgage contained the following consideration and defeasance clauses:

To SECURE to Lender (a) the repayment of the indebtedness evidenced by the Note, with interest thereon, the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage, and the performance of the covenants and agreements of Borrower herein contained, and (b) the repayment of any future advances, with interest thereon, made to Borrower by Lender pursuant to paragraph 21 herein (herein "Future Advances"), Borrower does hereby grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the County of Walker, State of Alabama:

. . . .

22. Release. Upon payment of all sums secured by this Mortgage, this Mortgage shall become null and void, and Lender shall release this Mortgage, without charge to Borrower. Borrower shall pay all costs of recordation, if any.

The 1141 mortgage also contained the following clause regarding future advances:

21. Future Advances. Upon request of Borrower, Lender, at Lender's option prior to release of this Mortgage, may make Future Advances to Borrower. Such Future Advances, with interest thereon, shall be secured by this Mortgage when evidenced by promissory notes stating that said notes are secured hereby.

The Central Bank mortgage contained the following similar consideration and defeasance clauses:

KNOW ALL MEN BY THESE PRESENTS, That C. Marshall Bennett and Faye Bennett (hereinafter called the

1. The 1141 mortgage was recorded in the Pro-    bate Office in Volume 1141 at page 652.

Mortgagor) for and in consideration of Mortgagor's indebtedness unto the Central Bank of Walker County, (hereinafter called the Mortgagee) in the sum of Twenty five thousand and no/100 Dollars as evidenced by Mortgagor's note of even date, the final installment of which matures March, 1981, and in order to secure the payment thereof (including any late charges in connection therewith) and of any other obligation of the Mortgagor to the Mortgagee, due or to become due, now existing or hereafter contracted as maker, endorser, guarantor, surety, conditional vendee or otherwise, including but not limited to obligations arising by use of Master Charge credit cards, overdrafts, secured and unsecured installment loans or purchases whether made directly from mortgagee or from an immediate or remote assignor of mortgagee, all of which obligations are hereinafter referred to as "said indebtedness", do hereby grant, bargain, sell and convey unto the said Mortgagee the following described property situated in Jasper, Walker County, Alabama, to-wit:

. . . .

This conveyance is a mortgage, and upon the payment of said indebtedness with the interest thereon, the same is to be void.

The Central Bank mortgage did not contain a provision similar to paragraph 21 of the 1141 mortgage which required specific reference to the mortgage if future advances were to be secured thereby.

At the time of this March 6, 1979 transaction, the Bennetts were in default on their floor plan financing agreement and First National was in the process of liquidating the inventory. Mr. David O'Mary, Loan Officer with First National, testified that no part of the floor plan deficiency was included in the March, 1979 transaction. Mr. O'Mary testified that this was because the bank could not ascertain the extent of the deficiency until the liquidation of the inventory was completed. Mr. Bennett also testified that the floor plan defi-

ciency was to be kept completely separate from the March 6, 1979 transaction. Mr. O'Mary, however, testified that First National understood that the floor plan deficiency would be secured by the 1141 mortgage.

Sometime after the liquidation of the boat inventory, Mr. Bennett executed a note in favor of First National evidencing the floor plan deficiency indebtedness in the amount of $16,441.62. This note, which was executed on May 4, 1981, made no reference to the 1141 mortgage as required by paragraph 21 of that mortgage for that future advance to be secured by the real estate. When asked on cross-examination why this May 4, 1981 note made no reference to the 1141 mortgage when it was supposedly the bank's intention that the floor plan deficiency, when determined, was to be secured by the 1141 mortgage, Mr. O'Mary testified that it was an "oversight."

This May 4, 1981 note was refinanced by a note which was executed by the debtors on August 2, 1983 in favor of First National in the face amount of $15,471.70. This note refinancing the floor plan deficiency specifically states that it is secured by the "Real Estate Mortgage dated March 6, 1979".

The Bennetts also became indebted to National Refining for gasoline and other petroleum products used by the debtors in their business. Unbeknownst to First National, the Bennetts on November 24, 1982 executed a promissory note and a second mortgage on the "Curry School Property" in favor of National Refining in the face amount of $16,567.08.

First National contends that the August 2, 1983 refinancing of the floor plan deficiency is secured by the real estate under both the 1141 mortgage and the Central Bank mortgage by the "dragnet clauses" contained in both mortgages. National Refining, however, advances several arguments in support of its contention that its second-mortgage indebtedness takes priority over the floor plan indebtedness. National Refining contends: (1) that the

"dragnet clause" in the 1141 mortgage is invalid since it is ambiguous and does not express a clear and explicit intent that the mortgage will secure other indebtedness; (2) that First National cannot rely upon the Central Bank mortgage because the dragnet clause contained therein is likewise invalid and because this mortgage became "merged" into the 1141 mortgage since the assignment was part of the consideration for the 1141 mortgage; and (3) that the floor plan deficiency notes are not "future advances" since no new monies were extended and since no evidence was introduced to suggest that the Bennetts requested the extension of credit pursuant to paragraph 21 of the 1141 mortgage.

### CONCLUSIONS OF LAW AND APPLICATION TO FACTS

Whether other debts between the same parties are secured under a "dragnet clause" depends upon the intention of the parties, *Malkove v. First Nat'l Bank,* 295 Ala. 191, 195, 326 So.2d 108, 111 (1976), at the time of the execution of the mortgage. *See First Nat'l Bank v. Cotton,* 231 Ala. 288, 164 So. 371 (1936). The "dragnet clause" must evidence a clear and explicit intent for the real estate to secure future advances. *In re Bonner,* 43 B.R. 261, 262 (Bktcy.N.D.Ala.1984); *Underwood v. Jarvis,* 358 So.2d 731, 735 (Ala.1978). This is especially true when a debtor owes several notes and gives a mortgage expressly securing one; any intention to cover other existing notes should be quite clear and explicit to say the least. *First Nat'l Bank v. Bain,* 237 Ala. 580, 583, 188 So. 64, 67 (1939).

The Court concludes that the "dragnet clauses" in both the Central Bank mortgage and in the 1141 mortgage fail to clearly and explicitly manifest the parties' intention that the real estate would secure future advances. While both of the consideration clauses provide for future advances, the defeasance clauses make no

reference to future advances. The consideration clause and the defeasance clause of each mortgage must be construed together, and the defeasance clause must clearly identify the terms and conditions upon which the mortgage would cease being security. *In re Bonner,* 43 B.R., 261, 263 (Bkrtcy.N.D.Ala.1984) *Underwood v. Jarvis,* 358 So.2d 731, 735 (Ala.1978). Because the defeasance clauses in the mortgages which are under consideration in the instant case fail to make any reference whatsoever to future advances, the Court finds the "dragnet clauses" are ambiguous and thus fail to meet the above-stated test of validity. *See Underwood v. Jarvis,* 358 So.2d 731, 735 (Ala.1978) (defeasance clause: "If said note paid in full. . . ."); *Malkove v. First Nat'l Bank,* 295 Ala. 191, 326 So.2d 108 (1976) (defeasance clause: "If ... pay the ... $3,500...."). This ambiguous language must be construed against the drafting party. *In re Bonner,* 43 B.R. 261, 263 (Bkrtcy.N.D.Ala.1984); *Jehle-Slauson Const. Co. v. Hood-Rich, Architects and Consulting Engineers,* 435 So.2d 716, 720 (Ala.1983). The Court, therefore, concludes that the indebtedness for the floor plan deficiency which was evidenced by the notes which were executed by the debtors [2] on May 4, 1981 and August 2, 1983 is not secured by either the 1141 mortgage nor by the Central Bank mortgage.

The 1141 mortgage is deficient in another respect. The defeasance clause provides that the mortgage will cease to be security "upon payment of all sums", but the inartfully drafted consideration clause uses the word "sums" only with reference to the expenses incurred for the protection of the collateral. Thus, this is yet another ambiguity in the 1141 mortgage.

The Court's conclusion is supported by several factors. First, the Court notes that the May 4, 1981 note for the floor plan deficiency makes no reference to the 1141 mortgage as required by paragraph 21 of

---

**2.** The May 4, 1981 note was executed only by C. Marshall Bennett. Both Mr. and Mrs. Bennett

executed the August 2, 1983 note.

**52**

that mortgage. Thus, even if the dragnet clause in the 1141 mortgage had met the test for validity which has been set out in the cases which were discussed above, this note would not be secured by the 1141 mortgage by its own terms. While the August 2, 1983 note does make specific reference to the 1141 mortgage in accordance with paragraph 21 of the said mortgage, this reference appears to the Court to be an after-thought; and the failure to refer to the 1141 mortgage in the May 4, 1981 note is evidence that the parties did not intend the 1141 mortgage to secure the floor plan deficiency when the 1141 mortgage was executed on March 6, 1979. As was stated in the *Malkove* case, "If the parties had intended the [1979] mortgage to include other loans, it would have been a simple matter to draft their intent in it." *Malkove v. First Nat'l Bank*, 295 Ala. 191, 195, 326 So.2d 108, 111 (1976).[3]

■ Further, both Mr. Bennett and Mr. O'Mary testified that the floor plan indebtedness was to be kept separate from the March 6, 1979 transaction. Mr. O'Mary's stating that the failure to refer to the 1141 mortgage in the May 4, 1981 note evidencing the floor plan deficiency was an "oversight" does not sufficiently explain the omission; and the Court is not, therefore, persuaded that the inclusion of the floor plan deficiency depended upon the ascertainment of the amount of the deficiency pending the completion of the liquidation of the boat inventory.[4]

Because the Court has concluded that the indebtedness for the floor plan deficiency is not secured because the dragnet clauses in both the 1141 and Central Bank mortgages are invalid, the Court need not address the other contentions of National Refining. A separate order consistent with this opinion will be entered.

---

**3.** The Court notes that its position on this point might be different had the dragnet clauses in both mortgages been in valid form; but since the Court has already determined both dragnet clauses to be deficient, any comment on this postulated situation would be obiter dicta.

---

**4.** Such evidence is not excluded by the parol evidence rule where the Court determines the writing to be ambiguous. *See Johnson v. Johnson Chevrolet, Inc.,* 633 F.2d 716 (5th Cir.1980) (Unit B).